# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1411

_____

| | | |
|---|---|---|
| Jay Campbell; Kirk Lane, | * | |
| | * | |
| Appellees, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Citizens for an Honest Government, | * | Eastern District of Arkansas. |
| Inc., d/b/a Integrity Films; Jeremiah | * | |
| Films, Inc.; Pat Matrisciana, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted:  January 8, 2001

Filed:  July 10, 2001

_____

Before BEAM and MORRIS SHEPPARD ARNOLD, Circuit Judges, and ALSOP,[1] District Judge.

_____

BEAM, Circuit Judge.

_____

[1]The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota, sitting by designation.

Pat Matrisciana,[2] through companies of which he is the chairman and president, produced and released a video indicating Jay Campbell and Kirk Lane, both law enforcement officers, had been implicated in the deaths of two teenage boys and a subsequent cover-up. Campbell and Lane responded by bringing this diversity action for defamation. A jury found Matrisciana liable and judgment was entered in favor of the officers. Because we find that the record does not support the verdict, we reverse.

## I. BACKGROUND

The video, Obstruction of Justice: The Mena Connection, which was released in May of 1996, portrays various aspects of a botched investigation of the deaths of two teenage boys, Kevin Ives and Don Henry. It associates various players with one another and insinuates illegal activity and complicity among assorted government entities, politicians, and law enforcement officers. The only reference to Campbell and Lane is found in a narrated graphic toward the video's end:

SUSPECTS IMPLICATED IN IVES/HENRY
MURDERS AND COVER-UP

DAN HARMON, Prosecutor
RICHARD GARRETT, Deputy Prosecutor
JIM STEED, Sheriff
JAY CAMPBELL, Officer
KIRK LANE, Officer
DANNY ALLEN, Officer

---

[2]We refer to appellants collectively under Matrisciana's name.

The narrator says: "Eyewitnesses have[3] implicated several people in the murders and subsequent cover-up including . . . . "

The record in this case reads like a John Grisham novel. However, unlike The Pelican Brief or The Firm, here the lines between fact and fiction are blurred.

In the early morning hours of August 23, 1987, the mangled bodies of two teenage boys, Kevin Ives and Don Henry, were found on railroad tracks in a secluded area in Saline County, Arkansas, after having been run over by a train. The train crew reported that the boys appeared to have been lying on the tracks. Initially, their deaths were ruled accidental, resulting from marijuana intoxication. However, later their bodies were exhumed and a second autopsy was conducted by a physician from Atlanta, Georgia. After a lawsuit by the parents of Kevin Ives, the cause of death on their death certificates was changed to homicide. As the theory goes, they were first killed and their bodies then laid on the tracks to make their deaths appear accidental.

Because of the bizarre circumstances of the deaths and a perceived lack of investigation by law enforcement entities, Linda Ives, Kevin's mother, began investigating the deaths herself, seeking reports from various law enforcement agencies through whatever means available, and prodding those agencies to pursue the investigation. Early on, she worked with Dan Harmon, who was appointed special prosecutor on the case.[4] At one point, Harmon told Ives that the killers would be

---

[3]The plaintiffs' exhibit, labeled "Statement in question from videotape," uses the present plural verb, "have," while the defendants' exhibit, labeled "Transcript of Video 'Obstruction of Justice: The Mena Connection,'" uses the past participle, "had."

[4]Later, Harmon was elected to the position of prosecutor and held that position until 1996. He has since been convicted of various offenses committed during his tenure, such as interference with commerce by threats of violence, possession of marijuana, and general racketeering.

appearing before a grand jury the following day. Campbell and Lane were among the various individuals called to testify on that date, December 2, 1988.

Previously, on June 20, 1988, law enforcement officials twice interviewed Ronnie Godwin while he was incarcerated in the Jefferson County Jail. Richard Garrett, a deputy prosecutor working with Harmon, was present for one of the interviews. Godwin indicated that, while returning home from Gigi's nightclub on August 22 or 23, 1987, he pulled off the road when he observed a "police car that was gray in color with three antennas on the trunk and a spotlight by the driver's door sitting in the driveway to the . . . grocery store." He saw two men he believed to be police officers. One was pushing a teenage boy up against the telephone booth. Another teenage boy was lying or kneeling on the ground. The men then put the boys in the back of the car and drove over the crest of a hill near the grocery store, only to return five or ten minutes later. When the car returned, Godwin did not see the boys but saw something that looked like a garbage bag in the back seat. Godwin also provided a diagram detailing the locations of all the individuals in relation to one another, the grocery store, the phone booth, the road by which the car exited and returned, and his observation point. Godwin described "the larger of the two" officers, who was pushing the boy, as being "about 200 pounds, six foot tall, with sort of long brown hair, wearing a white or a light color shirt." The other was described as being the smaller of the two and wearing a khaki shirt. On another occasion, a person thought to be Godwin contacted the father of Don Henry and related the story to him. Godwin's statements to law enforcement officers and to Henry were all substantially similar.

At the time of the boys' deaths, Lane was an undercover detective for the narcotics division of the Pulaski County Sheriff's Office, previously having worked for the Benton Police Department. Campbell was a lieutenant with the Pulaski County Sheriff's Department. The two worked together, and at times, their investigations would spill over into a portion of Saline County that abutted Pulaski County. Harmon told several individuals, including Ives, that the descriptions provided by Godwin fit

-4-

Campbell and Lane. The car Godwin described was somewhat similar to a description provided by Alan Smith, who had heard police vehicles and walked to the scene of the boys' deaths to see what was happening. In a July 6, 1988 interview, Smith indicated that before the commotion, he observed an undercover police car in the vicinity to which Godwin referred. He said the car was blue and that the way he knew it was an undercover police car was because "[i]t had antennas, or something." State police Sergeant Barney Phillips asked Smith if he knew Lane and, although Smith had "heard of him," it appears that he would not have known him by sight.

On February 21, 1990, while incarcerated at the Garland County Jail, Mike Crook, the proprietor of Gigi's, gave a statement to Phillips. The report states that on the morning the boys' bodies were found:

> [A] Mexican looking guy, who he only knows as "Jerry," came by and told them that late last night he was sitting across from the Ranchette Grocery Store . . . trying to catch his wife with her boyfriend, when two boys walked up to the grocery store and one boy rode up on a motorcycle and the three of them were there smoking a joint.

The boy on the motorcycle then rode off. Then, "an unmarked police car pulled up and two men in plain clothes got out and . . . one of them was Kirk Lane, who used to work for the Benton Police Department, and the other guy he did not know but he was a large man." The two boys and "these two cops got into an argument and the two cops beat the boys unconscious and threw them into the car and then drove off."

Although there are discrepancies in the times, three reports placed two teenage boys at the grocery store either late the night before, or early morning of the day the boys' bodies were found. Godwin estimated the time to be approximately 2:30 a.m. and, on the morning the bodies were found, "Jerry" told Crook that he had observed the incident "late last night." In addition, a person named Sandy Duncan told Mr. Henry that she saw the boys at the grocery store at approximately 4:00 a.m.

In 1994, Linda Ives was referred to Matrisciana[5] by retired Arkansas Supreme Court Justice Jim Johnson and was initially contacted by John Hillyer, a cameraman who had done freelance work for NBC and had worked with Matrisciana on The Clinton Chronicles. Hillyer told Ives "that they were talking to people who had complaints . . . about government and probably specifically Bill Clinton in particular." Because Matrisciana was "very moved and touched" by Ives' story, he decided to produce the video, Obstruction of Justice.

Hillyer also introduced Matrisciana to Jean Duffey. Duffey had previously been a deputy prosecutor for Saline County and the director of a drug task force, where her duties included investigating and prosecuting drug trafficking offenses. Duffey indicated that she had been developing information detrimental to Harmon and, consequently, was terminated from the drug task force when, soon after Harmon was elected prosecutor, he began challenging her in the media and encouraging the task force board of directors to fire her, culminating in her being investigated for missing funds.[6]

---

[5]By way of context, appellant Matrisciana is an ordained Baptist minister who got into the "motion picture film business" because of his "moral outrage" and to fill a perceived void in the "establishment" or "mainstream" media for telling the "truth." He had been in this business for twenty-five years at the time of trial, yet in recent years his companies apparently developed a specialty in pursuing conspiracy theories related to former President Bill Clinton, who, as near as we can tell, was tossed into the video that is the subject of this appeal just for flavor. Matrisciana previously produced another video, The Clinton Chronicles. With regard to the Obstruction of Justice video, Jean Duffey stated in a deposition, "Of course, all the right wing media just ate it up, which didn't impress us. Of course, they were after any connections to discredit Bill Clinton, which we didn't discourage," and that she "just wanted the story told."

[6]Duffey testified that the task force's fiscal officer admitted to forging Duffey's signature but claimed that Duffey had given her permission to do so. Duffey also testified that neither she nor the fiscal officer were ever prosecuted. Campbell and Lane do not challenge these assertions.

John Brown was an investigator for the Saline County Sheriff's Department from 1992 to 1994, and also acted as a factual investigator for the video. After The Clinton Chronicles had been released, FBI agent Phyllis Cournan introduced Brown to Matrisciana by inviting him to attend several meetings that she had been forbidden to attend. While employed by Saline County, Brown investigated the deaths of the Ives and Henry boys and elicited a statement from Sharline Wilson implicating herself, Harmon, and a number of others in the deaths. However, Brown, who was called by Campbell and Lane, testified:

> There was a specific time frame that is unaccounted for. If you believe the Sharline Wilson confession and corroborating witness statements of the other two alleged eyewitnesses, then there is a time frame that is unknown. I have no knowledge. Current investigators may have knowledge of what happened during the time frame. It is believed that, again, based on this confession and the other two eyewitnesses' testimony, that these two young men were confronted and may have escaped at some point and then were brought back to the tracks.

> . . . .

> They appeared at a telephone booth there, as the story goes, and that someone attacked them while they were trying to make a phone call and put them in a car and drove them away. It was alleged to be, there had been supposedly in the state police case file information provided I think at a grand jury testimony or somewhere that there were two people that fit Mr. Lane and Mr. Campbell's description that [sic] were the two people.

This scenario was referred to as the "Kirk Lane/Jay Campbell scenario."

At trial, because Campbell and Lane had subpoenaed Godwin but released him when he appeared the morning of the trial, all information provided by and about him was received into evidence via reports and witnesses. Matrisciana claims to have relied

on Campbell and Lane's subpoena and, although Matrisciana called upon a private investigator to locate Godwin after his release, those efforts proved futile. Likewise, Campbell and Lane neither deposed nor called to testify Crook, Alan Smith, or Duncan.

However, Campbell and Lane offered into evidence statements by Godwin's mother, sister, and girlfriend, who all indicated that when he was drinking one could not believe what he said, and that he had not told them about what he had seen at the grocery store. Also, Lane testified that he and Campbell had "sent [Crook] to the pen during that period of time for possession of methamphetamine."

While Campbell and Lane further testified that they did not kill the boys, neither could proffer an alibi.[7] They did offer favorable testimony of character witnesses, including Michael Smith, a supervisor of an FBI organized crime and drug program;[8] the testimony of FBI agent Cournan; and Brown's testimony. Witnesses testified that no one had ever been prosecuted for the murders, nor had the Lane-Campbell scenario been disproven.

## II.   ANALYSIS

---

[7]Campbell testified, "Well . . . I guess the first time I had wished that I had known what I was doing [the night of the deaths] is when this videotape [came] out," despite having thought as early as 1988 that Harmon was trying to make him look like a suspect.

[8]Federal law limits the testimony that may be given by an employee of the Department of Justice concerning past investigations. 28 C.F.R. § 16.22. Therefore, the party seeking testimony of an FBI agent must submit a request to the Department of Justice specifying issues on which the agent will be asked to testify. The agent's testimony is then limited to the scope of the authorization letter issued by the Department of Justice. Here, direct questioning and cross-examination of the FBI employees were limited by appellees' requests and the resulting authorization letters.

## A.     First Amendment Considerations

"[T]he Constitution delimits . . . [the] power to award damages for libel in actions brought by public officials against critics of their official conduct." New York Times Co. v. Sullivan, 376 U.S. 254, 283 (1964).

### 1.     Falsity

If an allegedly defamatory statement is factual, we must be "concerned with its truth or falsity and whether the author would have reason to believe it was false." Price v. Viking Penguin, Inc., 881 F.2d 1426, 1445 (8th Cir. 1989). Therefore, in order to prevail in a suit for defamation, a public-figure plaintiff must show the falsity of the statements at issue. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775 (1986). This burden is placed on the plaintiff even though doing so may insulate from liability some false speech. Id. at 778. Furthermore, the protection for an author's rational interpretation of another's statement serves First Amendment principles by allowing her the interpretive license that is necessary when relying upon ambiguous sources. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 519 (1991) (distinguishing an author's interpretation of a speaker's ambiguous statement from her use of a quotation that purports to be a verbatim repetition of a speaker's statement).

The parties in the present matter do not dispute that, for purposes of this suit, the appellees, both law enforcement officers, are public figures, or that the statements were related to a public controversy. See, e.g., Time, Inc. v. Pape, 401 U.S. 279, 283-84 (1971); St. Amant v. Thompson, 390 U.S. 727, 728, 732 (1968); Price, 881 F.2d at 1429, 1431; Karr v. Townsend, 606 F. Supp. 1121, 1131 (W.D. Ark. 1985); Hollowell v. The Arkansas Democrat Newspaper, 737 S.W.2d 646, 647 (Ark. 1987). Furthermore, Matrisciana does not concede that the statements were false. Cf. Hollowell, 737 S.W.2d at 647. Although it is debatable as to whether the element of

falsity must be established by clear and convincing evidence or by a preponderance of the evidence, Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 661 n.3 (1989), here we find that Campbell and Lane failed to satisfy even the lower threshold. Cf. Thomson Newspaper Publ'g, Inc. v. Coody, 896 S.W.2d 897, 901 (Ark. 1995) (indicating jury applied preponderance standard, but failing to reach issue of whether the evidence supported finding of falsity).

In Price, we analyzed an author's reference to a plaintiff that included "'whom some of the Indians, at least, had suspected of *involvement* in the killing.'" 881 F.2d at 1443 (emphasis added) (citation omitted). There, we found that the term "involvement" is vague and, consequently, the statement was too vague for us to conclude the plaintiff had been accused of criminal conduct, which would have supplied a verifiable question for the factfinder. Id. at 1444. A plaintiff cannot "choose what meanings to attach to . . . statements where several are available." Id. But cf. Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990) (indicating that a reasonable factfinder could have concluded various printed statements about the plaintiff, including the assertion that he "'lied at [a] hearing after . . . having given his solemn oath to tell the truth,'" was actionable because the language was "not the sort of loose, figurative, or hyperbolic language" that would counter the impression that the writer seriously maintained the plaintiff had committed perjury) (citation omitted).

Price provides further compelling guidance for our current analysis. One statement quoted someone saying that he thought a law enforcement official killed an activist, then the excerpt in the plaintiff's complaint quoted the author saying that "'Inevitably, local suspicion focused on [the plaintiff].'" 881 F.2d at 1444 (citation omitted). We found that, even if we accepted the plaintiff's version of the statements, we would still affirm because the plaintiff could not show that the statement was false or made with reckless disregard. Id. "The fact at issue would be whether people suspect [the plaintiff] of being 'involved.'" Id. The plaintiff's denials of involvement did not, therefore, address the assertion. Id.

Here, Campbell and Lane fashioned their questioning as if the video had accused them of murder. However, like the term "involvement," the term "implicated," which Matrisciana used in the video, is somewhat vague. Definitions of "implicated" include: "to show to be also involved, usually in an incriminating manner," "to imply as a necessary circumstance, or as something to be inferred or understood," "to connect or relate to intimately," and to "intertwine." Random House Webster's Unabridged Dictionary 961 (2d ed. 1997).

To add to the ambiguity, the video's statement does not limit its scope to murder or to Campbell and Lane, but also refers to a "cover-up" and implicates other persons. It is unclear whether all the parties were implicated in both the murder and cover-up or whether some were implicated in the murder and others in the cover-up, and so on. Cf. Price, 881 F.2d at 1444 (given the arrangement and non-specificity of statements, it was "not clear whether local people suspected [the plaintiff] of murder, blackmail, or merely of poor investigating").

Moreover, the disparity between the written and spoken statements further bedims the message. While the narration is more concrete in that it refers to "eyewitnesses" having "implicated several people,"[9] the written message is much more amorphous and tempers the narration, merely titling a list, "suspects implicated in Ives/Henry murders and cover-ups." The record does not refute the latter message.

The most definite and, therefore, troublesome, aspect of the narration is the reference to "eyewitnesses." That term lends a certain tone of authenticity to the claim. However, appellees failed to prove the falsity of even the most damning interpretation. Law enforcement records, which were available to the public through freedom-of-

---

[9]We give the appellees the benefit of their translation of the narration, using "have" as opposed to "had." See ante n.3. The verb "had" would favor the appellants' position in that it suggests a past assertion that has since been discounted.

-11-

information devices, revealed that purported eyewitnesses implicated law enforcement officers in the deaths of the Ives and Henry boys, including the appellees, either by name and/or, more tenuously, by description. At least one report–Mike Crook's account of the mysterious and elusive eyewitness, "Jerry"–specifically named Lane. Descriptions given by Ronnie Godwin were not inconsistent with Lane and Campbell's physical appearances, albeit in a somewhat generic sense, and the description provided by Crook was not inconsistent with Campbell's physical description of himself or that provided by Godwin. Instead, Campbell and Lane attacked the credibility of the sources, which we discuss in greater detail in our analysis of actual malice. However, subsumed within the term "eyewitness" is an expectation that such individual's perception will eventually be tested and is not presumed to be beyond doubt. That Campbell and Lane challenged the credibility of purported eyewitnesses with hearsay evidence, at this stage, does not dispose of the validity of the statement that eyewitnesses implicated them.

Campbell and Lane also called FBI agent Cournan to testify. Because Campbell and Lane had limited their request for her testimony,[10] the Department of Justice's witness authorization letter confined her testimony to whether she told Matrisciana, Ives, or Duffey that Campbell and Lane had participated in, were involved with, or were suspected in the deaths. She denied being the source of the video's statement. She was not asked, however, whether purported eyewitnesses had indeed implicated Campbell and Lane. Her denial that she was a source does not negate or affirm other possible sources, namely the Godwin and Crook statements.

We find that, although Campbell and Lane attacked the credibility of the purported eyewitnesses, which would go to ascertaining whether they had in fact caused the deaths, their attack does not address whether purported eyewitnesses

---

[10]For explanation of Department of Justice testimony authorization process, see ante n.8.

-12-

implicated them. Nor did Campbell and Lane address whether they were alleged to have been involved in a cover-up. Therefore, they did not satisfy their burden of proving falsity by at least a preponderance of the evidence.

## 2. Actual Malice

Even if we assume Campbell and Lane satisfied their burden of falsity, we find their claims still fail. A public-figure plaintiff must do more than prove falsity to prevail in a defamation claim. Harte-Hanks, 491 U.S. at 681 (indicating that "[t]he fact that an impartial jury unanimously" concluded that the defendant's allegations were false does not satisfy the plaintiff's burden). Even if the defendant's remarks are proven both defamatory and false, a public-figure plaintiff must also prove by clear and convincing evidence that the defendant acted with actual malice–that is, that the defendant made false remarks with a high degree of awareness of probable falsity, or that the defendant entertained serious doubts as to the truth of his publication. Id. at 667; Price, 881 F.2d at1430 (interpreting New York Times, 376 U.S. at 279-80). The standard is, therefore, a "daunting one." McFarlane v. Esquire Magazine, 74 F.3d 1296, 1308 (D.C. Cir. 1996). Evidence of a defendant's ill will, desire to injure, or political or profit motive does not suffice. Garrison v. Louisiana, 379 U.S. 64, 78-79 (1964); Harte-Hanks, 491 U.S. at 665-67. Although the ultimate conclusion may be supported by evidence of a defendant's motive and of extreme departure from professional standards, courts must not place too much reliance on such factors–the record must clearly and convincingly demonstrate either the defendant's knowledge of falsity or his reckless disregard for the truth or falsity of the allegations. Harte-Hanks, 491 U.S. at 665, 667-68, 688.

In Harte-Hanks, no one disputed that the defendant's allegations had been denied by the plaintiff and five other witnesses before the story was published. Id. at 691. The defendant, nevertheless, "chose not to interview the one witness that both [the defendant-editor and plaintiff] claimed would verify their conflicting accounts of the relevant events." Id. at 683. After reviewing the record, the Court found that

discrepancies in testimony could "have given the jury the impression that the failure to conduct a complete investigation involved a deliberate effort to avoid the truth." Id. at 684-85. Given the trial court's instructions, the jury's answers to three special interrogatories, and an understanding of facts not in dispute, the record supported the jury finding of actual malice. Id. at 689-90.

In contrast, failure to investigate alone does not support a finding of actual malice. Id. at 692 (citing St. Amant, 390 U.S. at 731, 733). In St. Amant, the record did not support a finding of reckless disregard for the accuracy of statements even though the defendant had no personal knowledge of the plaintiff's activities, relied solely on an affidavit, failed to verify the information by those who might have known the facts, did not consider whether the statements defamed the plaintiff, and mistakenly believed he was not responsible for the broadcast because he was merely quoting the affiant's words. 390 U.S. at 730. The Court found that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Id. at 731. Still, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." Id. at 732.

Because Campbell and Lane are public figures, whether the evidence in the record is sufficient to support a finding of actual malice is a question of law. Harte-Hanks, 491 U.S. at 685. Although we review credibility determinations under the clearly-erroneous standard, we have a "constitutional duty to 'exercise independent judgment and determine whether the record establishes actual malice with convincing clarity,'" and, thus, "must consider the factual record in full." Id. at 659, 688 (citation omitted).

-14-

Any reckless disregard of the truth by factual editors Ives, Duffey, or Brown could only be imputed to Matrisciana on a theory of respondeat superior. E.g., Price, 881 F.2d at 1446; McFarlane, 74 F.3d at 1303 (reasoning that "actual malice is a First Amendment protection predicated on a subjective state of mind, which surely cuts against any extension of vicarious liability beyond respondeat superior") (internal citations omitted). Therefore, if these factual editors were not Matrisciana's employees, we require independent evidence of his culpability. Price, 881 F.2d at 1446. Here, jury instructions failed to distinguish between employee and non-employee agents. Although Matrisciana failed to object to the instructions, we find no evidence in the record to support a finding that he directly employed the three investigators.[11]

Consequently, we look to the information known to, and conduct of, the appellants themselves and their employees. Campbell and Lane's case-in-chief consisted of their own testimony[12] and that of Matrisciana, Brown, Cournan, Curtis

---

[11]Campbell and Lane's only evidence as to the relationship between Matrisciana and the factual editors included Matrisciana's testimony that he gave editorial control over factual matters to Ives and Duffey, which, at most, supports a non-employee agency theory. Furthermore, Matrisciana testified that he was the producer and described his role as being "like a general contractor." The defense presented testimony of Ives and Duffey, who only indicated that they were paid a percentage of the sales proceeds, which tells us nothing about the relationship, other than they did not perform their functions gratis.

[12]Campbell and Lane's testimony did not address whether eyewitnesses had implicated them, but instead went to whether they had murdered the boys and the effects of the accusation on their lives. They indicated that neither Ives nor Duffey asked for their side of the story. However, Brown testified that, while employed with the Saline County Sheriff's Department, he talked to Campbell and Lane about the accusation.

Although we do not intend to insinuate guilt, we note that neither had an alibi for the date and time of the deaths and, therefore, had they been asked for their side of the

Henry, an expert witness, and a myriad of character witnesses. Of Campbell and Lane's witnesses, the only testimony directly relevant to the issue of recklessness is that of Matrisciana, Cournan, Henry, and, to a more limited extent, the expert witness.

Matrisciana testified that "[t]he intent of this video was to present the truth," and that he "felt this [video] was true." We recognize that:

> Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

St. Amant, 390 U.S. at 732. Here, however, Campbell and Lane fail to show any such scenario with respect to Matrisciana's reliance on the investigations of Ives, Duffey, and/or Brown. The record suggests that Matrisciana was likely politically motivated to make the video–although his target was not the appellees–and Campbell and Lane contend Matrisciana specifically named them because he wanted to increase his profits. Assuming such to be the case, we still find insufficient evidence to support a finding

---

story, they very likely would not have contributed much more than a denial and perhaps an explanation of the animosity between themselves and Harmon, which was already apparent to the factual editors. We do not intend to place Matrisciana in the same league, but we also note that Bill Moyers, a seasoned and reputable journalist, has recently pointed out that "investigative journalism is not a collaboration between the journalist and the subject." *Trade Secrets* (PBS television broadcast, March 26, 2001) (transcript *available at* http://www.pbs.org/tradesecrets/transcript.html); see also Westmoreland v. CBS Inc., 601 F. Supp. 66, 68 (S.D.N.Y. 1984) ("The fact that a commentary is one sided and sets forth categorical accusations has no tendency to prove that the publisher believed it to be false.").

of actual recklessness. See Harte-Hanks, 491 U.S. at 667. The same goes for the testimony of Campbell and Lane's expert witness with regard to Matrisciana's departure from professional standards. Id. at 665.

As reason for Matrisciana to question the truth of the video's statement that eyewitnesses had implicated Campbell and Lane, which would thereby obligate him to conduct further investigation, the trial court focused on Brown having told Matrisciana that there was "no documentation" that justified that statement. However, although written documentation supporting allegations would certainly make defense attorneys' jobs easier, lack thereof does not amount to recklessness. Furthermore, the record includes some written documentation of the allegations. Moreover, in scrutinizing Brown's testimony, we find that his concern was not for the validity of the allegations but that "[a]nyone . . . listed as a suspect on that videotape could file a lawsuit and obtain information that could have been used in the criminal prosecution in the murder trial," presumably of the boys, and that Matrisciana might be sued. Brown also testified that he had discussed the Lane-Campbell scenario with Matrisciana several times; that when he first became involved with this investigation, as an employee of the Saline County Sheriff, he found the file had been "totally destroyed" and "a lot of documents were missing;" that he had been unable to eliminate the appellees as suspects, but that doing so was not part of his assignment;[13] that Ives' collection of documents was the most comprehensive and he acquired the most pertinent documents from her; and that Ives and Duffey had more thoroughly reviewed the documents. Perhaps most telling is Brown's testimony that the statement at issue is true; that it was his "understanding . . . [the appellees] were implicated in 1988;" that he was "still unaware at [the time of

---

[13]Brown testified that, while he was employed by the Saline County Sheriff, because the appellees "were officers in an adjoining county . . . it would be more proper if the FBI or state police talked to them . . . . So, therefore, [he] was not allowed in any manner to interview Mr. Campbell or Mr. Lane or pursue that aspect of that. [He] was told [he] was to leave them alone."

trial] . . . if [the appellees] ha[d] been cleared;" and that "[t]he scenario ha[d] been talked about forever. It's common knowledge."

The trial court also thought that the signed confession from Sharline Wilson, ante, at 7, which mentioned neither Campbell nor Lane, "len[t] support to the doubts of Mr. Brown." In a deposition, Brown stated that he had informed Matrisciana that he "had a signed confession from an individual taking responsibility for the deaths of Kevin Ives and Don Henry,"[14] and Matrisciana testified that he had seen that statement. However, failure to include Campbell and Lane's names does not necessarily exclude them. The so-called Lane-Campbell scenario did not require the appellees to be at the murder scene when the boys were actually killed, nor did Wilson's "confession" account for the period of time in which they would have been involved under that theory. Finally, questions had been raised as to the veracity of Wilson's statement.[15] Neither Sharline Wilson's purported confession nor Brown's concerns about being sued provided Matrisciana with sufficient awareness of probable falsity to require further investigation.

The record reveals that Matrisciana relied on investigations that had already been conducted, primarily by Ives and Duffey. We do not find it reckless for him to have relinquished editorial control over factual matters to them. Ives had been investigating the matter from shortly after her son's death in 1987, through the time of the video's release, some eight-plus years, and had a vested personal interest in pursuing the truth. Duffey had been a deputy prosecuting attorney for Saline County and the director of

_____

[14]The "signed confession" is presumably that of Sharline Wilson. Yet Brown testified that Wilson did not confess to killing the boys, which is consistent with her statement offered by the appellees as an exhibit.

[15]For instance, Brown testified that it was his "understanding that . . . about 85 percent of that confession . . . was corroborated. The other 15 percent was not, not able to corroborate [sic]."

a drug task force in Saline County. Campbell and Lane offered no basis for us to conclude that Matrisciana's reliance on them amounted to recklessness, other than questioning their lack of experience as journalists. We will not, however, limit protection of journalistic endeavors to those pursued by individuals with college degrees in mass communications. Furthermore, Ives, Duffey, and Brown were each responsible for approximately one-third of the video. We do not find it reckless for Matrisciana to have relied on the opinions of those responsible for two-thirds of the video over one individual responsible for one-third, particularly when Brown testified that he obtained the bulk of his information from Ives and that her files were more complete than those to which he had access.

Even if we attribute the knowledge of Ives, Duffey, and Brown to Matrisciana, we still do not find the requisite level of recklessness. Ives testified:

> [W]e relied on state police documents. We relied on other pieces of information naming either cops or in some instances naming names. We relied on videotape clips that we had. We relied on information that Jean Duffey's task force developed . . . . We relied on a number of things.

Duffey similarly testified to relying on a number of sources.

As we have said, rather than dispute that statements were made implicating them, Campbell and Lane instead focused on the credibility of the sources, offering statements in law enforcement records by Godwin's family that "[i]f he has been drinking then you can't believe a word he has to say," and testimony from the appellees that they had investigated Mike Crook for drug offenses and were instrumental in the arrest resulting in his imprisonment. Campbell and Lane also elicited testimony that Dan Harmon may have been at the bottom of many of the rumors. The record indicates Harmon had credibility problems because he was either implicated in the deaths himself

-19-

or because he was trying to subvert the appellees' investigation of one of his associates for drug offenses.

However, the record reveals that Godwin told his story twice to law enforcement officials and, presumably, once to Curtis Henry[16] after Godwin himself initiated the contact. Mr. Henry testified that "[t]he drunk was talked to several times by different people. I even talked to him. He was supposedly talked to by the police department, and I know Dan Harmon talked to him." Henry also testified that this person contacted him prior to the appellees being called before the grand jury, that this person had first contacted Harmon, and that Harmon told Henry to disregard the story as being from someone who was trying to get money. No one testified that Godwin ever solicited money for his story, nor that Godwin was thought to have been intoxicated when he told it. Interestingly, Campbell and Lane had subpoenaed Godwin but, after he appeared on the morning the trial began, released him from the subpoena without ever seeking his testimony.

In further efforts to discredit the alleged eyewitnesses, counsel for appellees elicited testimony from Ives that she knew Godwin and Crook were related by marriage, and that state police had speculated that "Jerry" and Godwin were one and the same. However, Ives explained that Crook's knowing both Godwin and Jerry was "one of the reason's [she] knew that Jerry was not the same eyewitness as Ronnie Godwin." According to Crook's statement, when Jerry told his story to Sheriff Steed, Steed put him in jail for failure to pay child support. Ives explained that she and Duffey "spent a day and a half at Saline County [C]ourthouse going through all of those records trying to find out" who Jerry was. They also tried to find him by checking jail records but found that records from previous sheriffs' tenures had been destroyed. In

---

[16]We presume that the person to whom Henry referred is Godwin. To infer otherwise would only serve to bolster the appellants' position, as that person could be considered yet another purported "eyewitness."

essence, their investigation only rendered more support for their theory of law enforcement collaboration in the cover-up. Also, although Crook had been arrested by the appellees for drug offenses, they failed to show that Ives and Duffey knew or should have known of that arrest.

All and all, statements and rumors corroborating the Lane-Campbell scenario or implicating them as suspects emanate, in varying degrees of detail, from multiple sources. In addition to the statements of Godwin and Crook, Brown testified that Herman Reeves, a Saline County constable, told him that Campbell and Lane had been named as suspects, as did former Sheriff Davis, who was also mentioned in the Lane-Campbell scenario, whom Brown testified "had some knowledge of the case file" and "some knowledge of the grand jury." Brown testified that David Smith[17] was a source of the rumor but had tried to dissuade Brown from pursuing the scenario. Also, although Brown expressed concern about naming Campbell and Lane for fear of being sued, in a video exhibit from a conversation in July of 1994, he stated that "very early on in the Henry and Ives homicide . . . [their] names appeared as possible suspects." To reiterate, Brown testified that the rumors about the appellees' involvement were "common knowledge."[18]

---

[17]David Smith was a lieutenant and the supervisor for the criminal investigation division for the Saline County Sheriff's Department when Brown went to work in that office in 1992.

[18]In a letter dated April 18, 1995, a prisoner of Leavenworth provided a version of the boys' deaths that differs from the Lane-Campbell scenario but implicated Lane and Campbell by name. He indicated that he received the information from another inmate who "was considered one of the more advanced drug dealers in the state."

A Wall Street Journal article published prior to the video's release also stated, "Mr. Campbell, working a narcotics beat at the time for a nearby town's police force, was subpoenaed by the original Saline County grand jury and appears in police reports on the train deaths case."

It is unclear, however, whether Harmon was the original source of many of these rumors. Harmon had credibility problems in that he was being investigated for involvement in drug offenses, Sharline Wilson had placed him at the scene of the deaths, and, he had been convicted of various crimes. If he was at the scene, in a somewhat spurious sense, he would have indeed been an eyewitness and, if the Lane-Campbell scenario were real, could implicate the appellees by his own first-hand knowledge. However, Campbell and Lane's theory is not that he pointed to them to detract attention from his involvement in the deaths, but from his illicit drug activities. Regardless of his motives, according to the sequence of events, it appears that Harmon did not contrive the story but passed on information gleaned from Godwin. His motive for passing along information does not explain the story itself. Campbell and Lane failed to explain how Harmon influenced either Godwin or Crook, or how Crook would know of Harmon's suggestion that the description provided by Godwin fit Campbell and Lane. Therefore, Lane and Campbell do not account for the commonalities in the various stories independent of Harmon's innuendos.

In Harte-Hanks, both parties agreed that only one person could have substantiated the truth or falsity of the defamatory statement there at issue, yet the defendants failed to interview that person. 491 U.S. at 682-83. Nor did the defendants review other telling records. Id. at 691-92; see also Curtis Publ'g Co. v. Butts, 388 U.S. 130, 157-58 (plurality); 169 (opinion of Warren, C.J.) (discussing the defendant's "slipshod and sketchy" investigation). Relying in part on the jury's answers to special interrogatories and its understanding of facts not in dispute, the Court in Harte-Hanks concluded that a jury could view such inaction as purposeful avoidance of the facts and, consequently, that the record supported a finding of actual malice. 491 U.S. at 690, 692-93.

In contrast, here there are multiple sources for the statement that eyewitnesses had implicated Campbell and Lane. Ives and Duffey credited information from various sources because it matched in significant respects that provided by others. Also, some

modicum of credibility may be attributed to statements told to authorities "under circumstances where lying could have serious consequences," such as Godwin and Crook giving statements to law enforcement officials. See McFarlane, 74 F.3d at 1305 (weight given to fact that source made statement to congressional investigators). In addition, Duffey interviewed a person who claimed to have been present when the boys were killed–Sharline Wilson–and tried to contact Godwin and Crook. Unlike Harte-Hanks, here we do not have the benefit of a jury's answers to special interrogatories to instruct us on what testimony the jury rejected and credited in its assessment. Cf. 491 U.S. at 690.

Moreover, Campbell and Lane failed to call any witnesses to disaffirm the statement that eyewitnesses had implicated them. Despite having Godwin available the morning of trial–whom Duffey and Ives had specifically relied upon in including the statement in the video–Campbell and Lane prevent us from considering his account of events by having released him without calling him to testify. Similarly, Campbell and Lane limited their request for the testimony of FBI agent Cournan–who was responsible for investigating potential involvement by law enforcement in the deaths–to whether she had told Matrisciana's factual investigators that Campbell and Lane were involved. Her testimony, therefore, is not dispositive in addressing whether *others* might have related such information to the factual editors. More telling would have been her response to the question of whether to her knowledge *any* alleged eyewitnesses had implicated Campbell and Lane.

Viewing each statement in isolation, there may have been reasons to doubt the veracity of Godwin, Crook, or Harmon. However, given the corroboration by multiple sources, we do not see obvious reasons to doubt the accuracy of the various reports. Also, although it would have been prudent of Matrisciana to insert the term "alleged" before, or "of dubious character" after the word "eyewitnesses," "[r]eckless disregard is not measured by what a prudent person would have investigated or published," Price, 881 F.2d at 1441, and we do not find that the omission amounted to actual

malice, see Time, 401 U.S. at 290 (finding that "[t]o permit the malice issue to go to the jury because of the omission of a word like 'alleged,'" despite the source relied upon suggesting the factual assertion was merely an allegation, "would be to impose a much stricter standard of liability on errors of interpretation or judgment than on errors of historic fact").

Campbell and Lane failed their burden of proving by clear and convincing evidence that Matrisciana, either himself or through Ives, Duffey, and/or Brown, had a high degree of awareness of probable falsity or entertained serious doubts as to the truth of the assertion.  We, therefore, reverse.

## B.    Evidentiary Issues

Matrisciana argues that the district court abused its discretion when it foreclosed cross-examination under 28 C.F.R. § 16.22, but contrary to Federal Rule of Evidence 611(b), regarding the personal bias and prejudice of FBI supervisor Michael Smith, whom Campbell and Lane called as a character witness.  The cross-examination Matrisciana sought related to Smith's involvement in the investigation of the deaths. Because of our resolution on the merits, we need not reach this issue.

Similarly, he argues that the district court abused its discretion in its Rule 403 analysis of unfair prejudice when it excluded hearsay evidence on which Ives and Duffey had relied.  That evidence would have called into question the otherwise stellar portraits of Campbell and Lane's character painted by their parade of character witnesses.  Matrisciana contends that the hearsay evidence accusing Campbell and Lane of comparable bad acts would have demonstrated that Ives and Duffey were not reckless in believing that the officers were involved in the boys' deaths.  Although we need not resolve the issue, and assuming we can attribute the actions of Ives and Duffey to Matrisciana, we tend to agree with him.  The evidence, although clearly prejudicial to Campbell and Lane, goes to the very essence of the issue at stake:  the

appellants' state of mind.  See Berry v. Oswalt, 143 F.3d 1127, 1133 (8th Cir. 1998); Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1104 (8th Cir. 1988) (indicating that evidence of prior acts should normally be freely admitted where the issue is motive); cf. Harte-Hanks, 491 U.S. at 666 (discussing the plaintiff's obligation to prove the defendant's state of mind). Furthermore, Campbell and Lane's own questioning and witnesses opened the door to contrary testimony regarding their character and to the excluded allegations specifically.[19]  Had Matrisciana's evidence been received, Campbell and Lane could have cross-examined his witnesses and perhaps called their own to address the integrity of that evidence and why it might have raised further questions Matrisciana should have seriously resolved before relying upon it.  They would thereby have had opportunities to ameliorate the possibility of any unfair prejudice.

## III.   CONCLUSION

On the issue of defamation of public figures, we conclude that the evidence does not support the judgment and, therefore, reverse and remand for entry of judgment of dismissal.  "In this setting, we have decided that the Constitution requires more speech rather than less."  Price, 881 F.2d at 1446.  So as not to deter speech on issues of public concern, before liability may be imposed for public-figure libel, defendants must have acted in ways that more than departed from reasonably prudent conduct.  Harte-Hanks, 491 U.S. at 688.  While we are not afficionados of conspiracy theories, we suppose that if Matrisciana's assertions were true, there would be "inherent difficulties in verifying or refuting" such a claim, given the alleged pervasive involvement of law

---

[19]The court's ruling also created the opportunity for appellees' counsel to argue during his closing statement that "there[ had] been no witness even called . . . that would question the reputation of these two gentlemen by the other side."  In addition to the appellants' state of mind, one would think that the excluded evidence would go to damages.

enforcement in his theory. See McFarlane, 74 F.3d at 1305 (rejecting libel claim partly because of the inherent difficulties in verifying or refuting a claim that someone is the agent of a foreign power). The evidence surrounding Matrisciana's publication of the statement that eyewitnesses had implicated Campbell and Lane does not clearly and convincingly show reckless awareness of probable falsity or actual belief in falsity.

However, to say that Matrisciana did not cross the line into public-figure libel is not to say he stayed within the bounds of ethics and fairness. We stress that, because of First Amendment considerations, the burdens we have placed on Lieutenants Campbell and Lane are great. That they "cannot surmount these obstacles implies no condemnation of [them]." Price, 881 F.2d at 1446. The various witnesses who attested to their character, along with their many years of public service bode well for them. "Unfortunately, [they] also became involved in public controversies during [their] service and, in the posture of this case, we must focus on the bad things that have been said." Id. at 1447. That Lieutenants Campbell and Lane have failed to disprove the disputed statements at the requisite levels should not undermine their accomplishments nor diminish their stature.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.